CHAMBERLAIN v. FORBES.

MORTGAGES—TAX TITLE.
> Where a mortgage was assessed as an interest in real estate
> under the tax law of 1891, and the land was sold to the State
> for nonpayment of the tax, neither the mortgagor nor his
> wife, who joined in the mortgage, could purchase the title of
> the State and set it up against the mortgagee, such purchase
> amounting only to a payment of the tax.

Appeal from Monroe; Kinne, J. Submitted January 31, 1901. Decided February 27, 1901.

Bill by Ruth Chamberlain against Elizabeth Forbes to set aside a mortgage. From a decree for defendant on her answer in the nature of a cross-bill, complainant appeals. Affirmed.

*C. H. Rose* and *Willis Baldwin*, for complainant.

*Landon & Lockwood* and *E. S. Clarkson*, for defendant.

LONG, J. This bill was filed to set aside a mortgage given by the complainant and her husband, William Y. Chamberlain, to Sidney Forbes, administrator, etc., and assigned to defendant. The defendant answered, and asked the benefit of a cross-bill, and that a tax title upon the premises held by the complainant might be decreed null and void as to defendant's mortgage, and that the pretended purchase of said tax title be declared a payment of the tax. A decree was entered in accordance with the prayer of the cross-bill, and complainant appeals.

The complainant is the wife of William Y. Chamberlain. On the 24th day of February, 1891, they gave a mortgage to Sidney Forbes, administrator of the estate of

Daniel Forbes, deceased, for the sum of $2,800, upon two pieces of land (one of 80 acres and the other of 30 acres) in the township of Ash, Monroe county. The pieces of land were separated by a highway, and constituted their farm. They resided upon the farm, the house being on the 80-acre piece. This had been their homestead, for about 10 years. The mortgage contained a clause requiring the mortgagors to "pay and discharge, within the time prescribed by law, all such duties, taxes, and assessments, extraordinary as well as ordinary, as shall by any lawful authority (whilst the moneys secured by these presents are unpaid) be imposed upon the premises," etc. From time to time the Chamberlains paid something upon the interest on this mortgage, down to November 19, 1897. Sidney Forbes, administrator, assigned this mortgage to Elizabeth Forbes, his mother, the defendant, March 5, 1891, and the estate of Daniel Forbes was closed and he was discharged as administrator. The defendant foreclosed this mortgage by advertisement, and the property was bid in by her December 30, 1899, for $3,999.05, the amount then due,—principal, interest, and costs. On the 24th day of November, 1899, the bill in this case was filed. It is claimed by the defendant that this was the first actual notice she or her agent had of the nonpayment of any tax upon the property, or of any adverse claim by the complainant.

In 1893, more than two years after the assignment of the mortgage to the defendant, and after the estate of Daniel Forbes was closed and the administrator discharged, there was assessed in the township of Ash to "Daniel Forbes' estate," mortgagee, the sum of $2,500, and to William Y. Chamberlain, owner, the sum of $1,700, making the assessed value of the premises described in the mortgage $4,200. Chamberlain did not pay the tax on the mortgagee's interest, and the same was not collected, and the land was returned delinquent therefor. At the annual tax sale held in December, 1895, the premises were bid in to the State. In December, 1896,

these premises were on the "State tax list" for sale. The deputy county treasurer notified Mr. Baldwin, who was the attorney of William Y. Chamberlain, that the land was for sale, and Mr. Baldwin notified Mr. Chamberlain. Mr. Chamberlain, in his testimony, states what was done:

"I came to his [Baldwin's] office first, and he came with me to the county treasurer's office. I wanted to redeem the land in the first place, and they would not let me. I wanted to pay the taxes. They would not let me, because they said they had to sell it, and I could not redeem. My wife had to furnish the money. I got the money from Mr. Baldwin, and paid it in. Mr. Baldwin said, 'If it is going to be your wife's money that is going to pay for it, bid it off to her;' and it was at his suggestion that the certificate was made in my wife's name. All the money I had at the time was $5. I had no other money at home. My wife had some."

He used the $5 he had, and borrowed the balance of Mr. Baldwin to pay the county treasurer.

It is the claim of the defendant that complainant had nothing to do with the purchase of this tax title, and knew nothing about it, and that she was equally ignorant as to the bringing of this suit; that her husband has done everything, simply using her name; that after the making of the mortgage, and before the tax sales in 1896, the complainant became the owner of the 80-acre piece; that there was a deed made from her husband to complainant. This deed is not recorded. The husband says, referring to the 80-acre piece: "I think I calculated it was hers in 1895 and 1896." In 1895 and 1896 the 80-acre piece was assessed to complainant, and the 30-acre piece to her husband. It is the further claim of the defendant that the complainant and her husband each owned a part of the premises; and that, at the time, the transaction was considered by them as a payment of the tax on their respective pieces, is evident from the indorsement made upon the back of the certificate of sale given by the county treasurer, signed by complainant:

"I hereby assign to Wm. Y. Chamberlain so much of

the foregoing certificate as shall cover his portion and part of the within-described premises.

"RUTH CHAMBERLAIN."

In the court below it was the claim of the defendant that, under the facts in the case, the purchase of the tax title amounted only to a payment of the tax and a redemption of the land.

It is apparent from this record that, at the time of the taking of the certificate from the county treasurer, both Chamberlain and his wife considered the transaction simply as a payment of the taxes, as the wife at once assigned to her husband "so much of the foregoing certificate as shall cover his portion and part of the within-described premises." The claim now made by Mrs. Chamberlain has no better foundation than it would have had had it been set up by Mr. Chamberlain himself. He did not go to the county treasurer to purchase the tax title, but to pay the taxes, but at the suggestion of his attorney he made the purchase in his wife's name. Whether, at the time of taking this certificate, the title to a part of the premises had been deeded to Mrs. Chamberlain, the record does not fully disclose. But it does appear that both Chamberlain and his wife treated the premises in that way; that is, that Mrs. Chamberlain had been deeded 80 acres, and Chamberlain owned the 30 acres. Whether this is so or not is of no great moment. They both signed the mortgage. It was expressly held in *Maxfield* v. *Willey*, 46 Mich. 255 (9 N. W. 271), that neither party to a mortgage can cut off the other's interest by bidding in the premises at a tax sale, if the other objects thereto.

The contract in the present mortgage provided that the mortgagors would "pay and discharge, within the time prescribed by law, all such duties, taxes, and assessments, extraordinary as well as ordinary, as shall by any lawful authority (whilst the moneys secured by these presents are unpaid) be imposed upon the premises," etc. It is not necessary to determine in the present case whose duty it was to pay the taxes on the mortgage, as the court below

decreed that they be paid by the defendant, and the defendant has not appealed. All we determine is that the mortgagors could not purchase the tax title, and then set it up as a title to defeat the mortgage.

The question was discussed at some length in the case of *Connecticut Mut. Life Ins. Co.* v. *Bulte*, 45 Mich. 113 (7 N. W. 707). It was there said:

"It is conceded that there are a great many cases in which parties standing in particular relations to the land, or to the owner or other person interested therein, are not suffered to acquire tax titles and rely upon them as against other claimants. Some of those are very plain, and it is quite unnecessary to do more than name them. A tenant, for example, who has covenanted to pay the taxes, cannot be suffered to neglect this duty, and then acquire a tax title which shall cut off the title of his land lord. Neither shall the purchaser in possession under an executory contract be allowed to cut off the rights of his vendor by a like purchase, nor a mortgagor that of his mortgagee. A tax purchase made while such a relation exists is made in wrong; and the law, in circumvention of dishonesty, will conclusively presume that it was made in the performance of duty, and not in repudiation of it."

The language in that opinion was cited and quoted with approval in *Brown* v. *Avery*, 119 Mich. 387 (78 N. W. 331).

The court very properly held that, under the circumstances here shown, the complainant would not be permitted to set up a tax title thus acquired to defeat the mortgage.

The decree must be affirmed, with costs to the defendant.

The other Justices concurred.