WESTINGHOUSE ELECTRIC & MFG. CO. v. SARANAC LAKE ELECTRIC LIGHT CO.

(Circuit Court, N. D. New York.    April 27, 1901.)

No. 6,500.

1. PATENTS—ANTICIPATION—BURDEN OF PROOF.

Where anticipation has been clearly shown, if the date of the application be taken as the date of invention, the burden of proof is transferred to the patentee to establish by satisfactory evidence that the invention was made at an earlier date.

2. SAME—PATENTABLE INVENTION.

In contemplation of law, an invention does not exist until the inventor's theories and ideas have been reduced to practical form; it cannot be predicated of mere speculation and conjecture, but must be based on something ascertained, definite, and certain.

3. SAME—ANTICIPATION—ELECTRICAL DISTRIBUTION.

The Kennedy reissue patent, No. 11,031 (original No. 407,294), for an improvement in the method of distributing and regulating alternating electric currents by secondary generators, is void for anticipation.

4. SAME—PRIOR PUBLIC USE—EXPERIMENTAL USE BY INVENTOR.

The inventor of a system of electrical distribution, designed primarily to regulate the current in an electric lighting system, established a temporary lighting plant in a small town at the expense of the company by which he was employed, and for three months furnished a limited number of lights to customers, for some of which a charge was made. The purpose, however, was entirely experimental,—to test the device in actual use, and to enable the inventor to perfect and improve it,—and the portions of the apparatus which embodied the invention were kept locked from public inspection. Held, that such use did not constitute a prior public use of the invention, which invalidated a patent thereof granted on an application filed more than two years later, after the device had been perfected.

5. SAME—INFRINGEMENT—ELECTRICAL DISTRIBUTION.

The Stanley patent, No. 469,809, for a system of electrical distribution, was not anticipated nor invalidated by prior public use of the invention, and is valid.   Claims 1 and 3 also held infringed.

In Equity.   Suit for infringement of patents.   On final hearing.

Frederick P. Fish and J. Edgar Bull, for complainant.
M. B. Philipp, C. E. Mitchell, and H. B. Brownell, for defendant.

COXE, District Judge.   This is an equity suit charging the defendant with infringement of two patents owned by the complainant. The first of these is reissued letters patent No. 11,031, granted September 24, 1889, to Rankin Kennedy, of Glasgow, Scotland, for an

improvement in the method of distributing and regulating alternating electric currents by secondary generators. The second patent is No. 469,809, granted March 1, 1892, to William Stanley, of Great Barrington, Mass., for an improvement in systems of electrical distribution.

### The Kennedy Patent.

The view which the court feels compelled to take of this patent renders extended discussion and analysis unnecessary. It can be sufficiently understood from the claim, which is as follows:

"The method of distributing and regulating alternating electric currents by secondary generators, which consists in producing in two or more derived circuits constituting the primaries of two or more secondary generators a counter electro-motive force which, when any secondary is open, is practically equal to the applied electro-motive force in its primary and in controlling said electro-motive force by the current flowing in the corresponding secondary when the secondary is closed in such manner that the current in the primary shall vary with and be approximately inversely proportional to the resistance in the secondary, substantially as described."

The application for the original patent was filed November 13, 1888. The original patent was dated July 16, 1889. The application for the reissue was filed August 28, 1889. It is conceded that the invention is anticipated unless the complainant has succeeded in showing that it was made in June, 1883—over five years prior to the time when Kennedy swore to the application and filed it in the United States patent office.

The patent being anticipated, if the date of the application be taken as the date of invention, the burden rests upon the complainant to satisfy the court that the invention was made at an earlier date. There is no presumption in favor of such a patent. The burden which rested upon the defendant in the first instance has been transferred to the complainant and it must furnish the court with convincing proof that the anticipation has been anticipated.

In Loom Co. v. Higgins, 4 Ban. & A. 88, Fed. Cas. No. 17,342, the court says, at page 98:

"The burden of proof rests upon the defendants to show, beyond a fair doubt, the prior knowledge and use set up; but, where they have sustained that burden by showing such knowledge and use prior to the patent, the burden of showing the still prior invention claimed, by at least a fair balance of proof, must rest upon the plaintiff."

Plow Works v. Starling, 140 U. S. 184, 198, 11 Sup. Ct. 803, 35 L. Ed. 404; Thayer v. Hart (C. C.) 20 Fed. 695.

The complainant assumes this burden and has attempted to discharge it by the introduction of three articles written by Kennedy and published in the Electrical Review of London in June, 1883, in which he describes some "interesting experiments." It is in the last sentence of the first of these articles that the invention of 1888 is said to be found, as follows:

"In parallel arc, however, the secondary generator is a beautiful self-governing system of distribution; but what about the size of conductors for such a system? Prodigious!"

This is the only time secondary generators in parallel arc are mentioned in any of the articles.

It seems to be conceded that the following are essential to the successful working of the method of the patent: First: A constant po-

tential generator.   Second: Closed magnetic circuit transformers.
Third: Lamps in parallel.   Fourth: Plurality of transformers.

It is also conceded that none of these is mentioned in any of the
Kennedy articles, but it is said that they are inferred, and that a
skilled electrician would be able to construct the full-grown system
from the emaciated skeleton thus exhibited.   The court is compelled
to think otherwise.

The impression produced upon the lay mind, at least, is that Ken-
nedy had no clear conception of a practical system in 1883 and
thought the obstacles so prodigious that he did not attempt to sur-
mount them.   If he had answered his question with the exclama-
tion "impossible," it is not probable that it would be now asserted
that he had solved the problem.   And yet though his answer did not
go to the extent of saying that the thing could not be done it was
one of discouragement and surrender.   He offered no solution and
intimated that a practical solution could not be found.   What he
did can hardly be called an abandoned experiment for there was no
experiment to abandon; it was only a tentative suggestion, an in-
genious theory, a clever idea which is altogether too nebulous a foun-
dation upon which to rest a patent which seeks to levy an immense
tribute from the art and which was not thought of until five years
afterwards.   If the articles had been written by some one else and
had been set up as an anticipation by the defendant it is easy to im-
agine with what contempt their indeterminate, incomplete and in-
feasible statements would be brushed aside by the complainant.   In
contemplation of law an invention does not exist until the inventor's
theories and ideas have been reduced to practical form.   It cannot
be predicated of mere speculation and conjecture; it must be based
upon something ascertained, something definite and certain.   Rob.
Pat. §§ 125, 127, 132.   "The mere existence of an intellectual notion
that a certain thing could be done, and, if done, might be of prac-
tical utility, does not furnish a basis for a patent, or estop others
from developing practically the same idea."   Standard Cartridge Co.
v. Peters Cartridge Co., 23 C. C. A. 367, 77 Fed. 630, 645.

But suppose that the articles contain the full statement for which
the complainant contends; how then stands the case?   In 1883 the
inventor published to the world a full description of his invention.
This act of itself seems inconsistent with the theory that he in-
tended to secure a patent.   If his purpose was to give the public
the benefit of his experiments his course was entirely natural, but
it was most extraordinary if he intended to secure a monopoly.   On
the 19th of November, 1886, Kennedy published a letter in the Elec-
trical Review in which he takes issue with Zipernowski and Deri
that they were the first to make "the simple connection of secondary
generators in parallel arc."   He maintains that he was the first to
do this and says:

"I then thought of and tried parallel arc connection and perfectly succeed-
ed in obtaining self-regulation.   There certainly is not much visionary about
that; the visions of a monopoly I am afraid are all on the other side, and
my experiments and published results are likely to somewhat mar the beauty
of monopoly visions.   *   *   *   I do not know anything about 'rational meth-
ods of connection of transformers,' I know only two methods of connecting to

the mains—series and parallel—both of which methods it is open for anybody to apply to any form of transformer."

Kennedy was not ignorant of the modus operandi of securing patents and received several in this country and in Europe prior to the patent in suit and after the letter of November, 1886, in which he expressly abandoned the right to the 1883 method to "anybody" who saw fit to use it. These patents were for transformation and distribution of electric energy, several of which would have supported the claim in issue, but no such claim was made.

The language of Mr. Justice Bradley in Loom Co. v. Higgins, 105 U. S. 580, 595, 26 L. Ed. 1177, 1183, seems appropriate:

"If Davis was the inventor of the wire motion applied to these looms, why did he never apply for a patent for it? He was already a patentee for a different and inferior apparatus. He knew all about the method of going about to get a patent. He belonged to a profession which is generally alive to the advantages of a patent right. On the hypothesis of his being the real inventor his conduct is inexplicable."

Between 1883 and 1888 other electricians had reduced the system of the patent to practice and they and the public had acquired rights of great value relying upon Kennedy's inaction and affirmative declaration that he had no monopoly and that what he had described was open and free to all. It is not necessary to hold that each of these acts and omissions considered separately worked an abandonment and dedication to the public; it is enough that taken together they lead to that result. In other words, there seems no escape from the conclusion that Kennedy intended that the public should have whatever he had contributed to the art in the 1883 articles referred to. His words are in harmony with his acts. He told the public that it was free to do all that he had done and knowing that the public had taken him at his word he made no effort to secure a monopoly until years afterwards.       .

The complainant practically concedes that the 1886 letter was an abandonment, but it argues that Kennedy's letter was addressed to the British public, that the gift was made only to Englishmen, and that the American public had no part or lot in the matter. There are many answers to this proposition, but a sufficient one is that the major premise is incorrect. Kennedy was not addressing the British public, but the skilled electricians of the world. His letter was not printed in a Glasgow paper, but in the Telegraphic Journal and Electrical Review, a periodical obviously designed to circulate among electrical specialists in every land and clime. That it was used as the medium through which citizens of other countries than England reached the electricians of every country is abundantly demonstrated in this record. He does not say that his method is open for Englishmen but "for anybody to apply."

### The Stanley Patent.

The specification of the Stanley patent says:

"My invention relates to a system of distribution of electricity for industrial and economical uses, with special adaptation to incandescent electric lighting, although it is applicable also to other purposes. For simplicity of illustration

I shall describe in this specification the application of the invention to incandescent lighting only. I employ for this purpose a dynamo-electric machine generating an alternating current and a number of induction coils or converters organized to transform the current which is in the main line, at or near the points of consumption, from one potential to another—namely, a greater or less potential or to the same potential—in a secondary circuit. In this secondary circuit incandescent lamps or other translating devices are included. * * * In the construction of the coils P and S the following principles are to be observed: The first thing to be determined is the length of the primary wire. This should be of such length that reacting self-inductively upon its own magnetic circuit the average counter potential so produced approximately equals the potential applied to the primary circuit. When so constructed, an ammeter will practically show no current when the secondary circuit is open. To obtain these results in practice I use the following method: I first choose the percentage of efficiency to be obtained. Then having selected a type of magnetic circuit affording as great magnetic conductivity as possible I apply such a length of primary conductor that acting self-inductively upon its core the difference of the counter potential and applied potential multiplied by the current in the converter shall equal the predetermined loss of energy inevitable in conversion and vary the length of primary wire until the desired results are attained. It is obvious that the co-efficients of induction in the dynamo and armature and converter may be made equal by energizing each circuit with the same induction. In the carrying out of my invention it is possible to use the same co-efficients of induction in the armature and the dynamo as are present in the primary circuit of the converters; but this equality is not necessary. Having by these means determined the length of the primary coil, the secondary is adapted to it in such a manner as to secure the desired potential according to the well-known laws affecting the operation of induction coils. I have usually related the potential of the secondary to the primary in the ratio of twenty to one. The size of the wire in the primary and secondary coils is in inverse proportion to their electro-motive forces."

The claims involved are the first and third. They are as follows:

"(1) In a system of electrical distribution, and in combination, an alternating current dynamo and converters electrically connected with the main-line conductors in multiple arc and organized to transform the current in the main conductors into currents of less potential and greater quantity in the secondaries, each converter made with a primary coil containing such length of wire exposed to magneto-electric induction that when operated by the dynamo with which it is to be used with its secondary circuit open the electrical pressure and counter-pressure in its primary circuit shall be equal with incandescent lamps or other translating devices in the secondary circuits, substantially as and for the purposes set forth." "(3) In a system of electrical distribution, and in combination, an alternating current dynamo and converters organized to transform the current generated by the dynamo into currents of less potential and greater quantity at or near the points of consumption electrically connected with the main-line conductors in multiple arc and having their primary circuits constantly closed, each converter adapted to the dynamo operating the system by making its primary coil of such length that when supplied with its full proportionate share of the entire normal electro-motive force of the machine, its secondary circuit being open, the electrical pressure and counter pressure in its primary circuit shall be approximately equal with translating devices in the secondary circuits of the converters to be cut out of the circuit when not in use without the introduction of any resistance in the place of them, substantially as and for the purposes set forth."

The defenses are: First: Anticipation by articles printed in various foreign publications, prior to November 25, 1885,—the date of Stanley's invention—describing the Zipernowski and Deri system at Budapest. Second: Public use more than two years prior to the application. Third: Abandonment. Fourth: Lack of invention. Fifth: Noninfringement.

Stanley's contribution to the art of electric lighting is an improvement upon the method described in the Kennedy patent. It still remained to discover a 'way to prevent the varying candle power of the lamps, on a given transformer, when a part of the lamps were turned off or on. If, for instance, there were 20 lamps on a transformer, and all were burning, the turning off of 10 would change the candle power of the remaining 10, increasing their luminosity. If they were turned on again the candle power of all would go down. The difficulty was a serious and perplexing one, and electricians generally were searching for a solution but always along the same lines. Stanley found a solution by doing what no one had ever thought of doing before. He discovered that he could remedy existing evils by regulating the length of the wire on the primary coil of the transformer. The patent tells those skilled in the art how to accomplish this result. To the uninitiated Stanley's rule seems indefinite and obscure, but electricians have no difficulty in understanding it. He determines the correct length of the primary coil by winding on wire after the transformer, in circuit, is connected with the dynamo, until the loss of energy represented by the formula $C^2R$ equals the predetermined loss of energy to be suffered in the system. The length of the wire is varied until the desired results are attained. The rule is thus succinctly stated by the inventor himself:

"I apply such a length of primary conductor that, acting self-inductively upon its core, the difference of the counter potential and applied potential, multiplied by the current in the converter, shall equal the predetermined loss of energy."

What Stanley did was an exceedingly valuable addition to the art. He remedied a serious defect; he secured without unnecessary waste of current constancy of secondary pressure as lamps were turned on or off; he struck out into a new path and brought back the prize which, if he had continued upon the old paths, he never would have found. Such a discovery cannot be attributed to the skill of the calling.

### The Zipernowski and Deri Article

Is the patent anticipated by the publication of an article in the London Electrical Review of August, 1885, describing the Zipernowski and Deri plant at Budapest? This inquiry must be confined strictly to the article. The question is not what was actually done at Budapest, but what does the article say was done there. The law provides that an inventor shall not be denied a patent because the invention or discovery was known or used in a foreign country. In order to defeat the patent the invention must have been known or used by others in this country or patented or described in a printed publication in this country or a foreign country. Rev. St. §§ 4886, 4923. The burden of proving anticipation rests upon the defendant and he must do this by clear and convincing evidence. Barbed-Wire Patent, 143 U. S. 275, 284, 12 Sup. Ct. 443, 450, 36 L. Ed. 154. The publication relied on must describe the invention in such a complete, clear and precise manner as to enable those skilled

in the art to reproduce it without the aid of the patent. If the differences are only those which the skill of the art will readily supply the publication will not be destroyed as an anticipation, but it will be destroyed if these differences relate to essential features, and independent investigation and experiment are required to explain obscurities and supply omissions. The mere assertion that the desired result has been accomplished without stating how, without describing the means which produced the result, is insufficient. Walk Pat. § 57; Hanifen v. Godshalk Co., 28 C. C. A. 507, 84 Fed. 649.

The article in question imparts no information upon the one subject which is the all essential feature of the Stanley invention, namely, the length of the primary wire and the method of determining the same. Would an electrician reading the article in August, 1885, know how to construct the coils P and S of the Stanley patent? Would a system of distribution constructed upon the information found in the article infringe the claims in question? It is thought not.

After pointing out the advantages of the system, and it is to be noted that the writer can hardly be charged with an overproduction of modesty in this regard, the article proceeds to describe the manner in which these advantages can be secured as follows:

"In order to increase the yield of induction apparatus their inductive action must be increased as much as possible. This can be effected, in the first place, by increasing the rapidity of the current pulsations, that is the changes of the direction of the current; secondly, by bringing the primary and the secondary wire as near to each other as possible; and, thirdly, by increasing the diameter of the iron core inside the coil."

This gives no information which is useful in remedying the defects with which the patent has to deal. It fails to tell electricians how the length of the primary wire can be co-related to the voltage and alternations of the current supplied. In short, it may be said, in the language of complainant's expert, that:

"A person reading these articles would be in the unenviable position of knowing with great exactness and detail the results that it was desired to obtain, without the slightest information as to how they were to be obtained, except that he was to use a type of transformer or induction coil which had first been described by Faraday in 1831, and in its perfected form by Varley as early as 1856."

The truth of this conclusion is still further demonstrated by the fact that although a large number of the foremost electricians of the world read the article and commented upon it none of them found out a way to remedy the defect, and the court is satisfied that no one did remedy it till Stanley showed them how.

### The Great Barrington Use.

The statute provides that an inventor who complies with the law in other respects may obtain a patent unless the invention has been introduced into public use in the United States for more than two years prior to the application. Rev. St. §§ 4886, 4887. The leading case upon this subject is Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000. The court says:

"That the use of the pavement in question was public in one sense cannot be disputed. But can it be said that the invention was in public use? The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a use. * * * When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. * * * It would not be necessary, in such a case, that the machine should be put up and used only in the inventor's own shop or premises. He may have it put up and used in the premises of another, and the use may inure to the benefit of the owner of the establishment. Still, if used under the surveillance of the inventor, and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvements as experience demonstrates to be necessary, it will still be a mere experimental use, and not a public use, within the meaning of the statute. While the supposed machine is in such experimental use, the public may be incidentally deriving a benefit from it. If it be a gristmill, or a carding machine, customers from the surrounding country may enjoy the use of it by having their grain made into flour, or their wool into rolls, and still it will not be in public use, within the meaning of the law."

Within this rule the court is of the opinion that the use in question was not public but was experimental. The application for the Stanley patent was filed August 15, 1888. The use at Great Barrington began March 16, 1886, and ended June 16, 1886, being in operation, subject to breakdowns and delays from faulty construction, for a period of three months.

The reasons which induce the court to say that this use is not fatal to the patent may be summarized as follows:

First: Stanley went to Great Barrington under a contract with the Westinghouse Company to perfect his system and make it commercially successful. The Westinghouse Company paid his salary, furnished large sums of money and imported from Europe not only expensive machinery but an expert electrician to assist in the work. All patents obtained for inventions at Great Barrington were to be assigned to the company. Both Stanley and Westinghouse were conversant with the provisions of the patent law and were working to secure for the company the monopoly of the best electric lighting system which human intellect could devise. It seems incredible that such men, dealing with interests of such transcendent magnitude, should abandon their vast schemes of wealth and empire in the electric world in order that they might pocket the paltry revenues from a 60-lamp plant in a country town.

Second: The experiments were of such a character that they had to be performed at a distance from the laboratory and dynamo. Stanley was endeavoring to elaborate a self-regulating system and the only sure way to prove such a system was to test it in actual use. This, of course, involved stringing wires about the town and putting lamps in public and private buildings, but no one save Stanley and his assistants were aware of the new elements which had been introduced into the combination. The engine and generator were hidden from public view in an old rubber mill, temporarily fitted up as a laboratory; the transformers were locked up. Writing, at the time, to Mr. Westinghouse the inventor says: "All the converters are under lock and key so that no one knows anything

about them." Nothing was visible that could give the public any information as to the character of the experiments. The poles, the wires, the lamps were visible and public; the essential features of the system were invisible and private. In short, the invention was not in public use.

Third: All of the persons acquainted with the work at Great Barrington testify unreservedly that it was experimental. Stanley says· "I was experimenting with alternating currents." Belfield, the English electrician, who came to this country at the request of Mr. Westinghouse to assist in the work, says:

"The sole object of the installation at Great Barrington, as I understood it, was entirely of an experimental nature, so that the faults of the system could be discovered and remedied in order that when the apparatus should be installed commercially there would be less chance of failure and the system would be a successful one."

Pantaleoni. who with others visited the plant in the interests of the Westinghouse Company, testifies:

"The whole idea of Stanley in going to Great Barrington was to try an experiment on the public. The laboratory was located quite close to the city. The alternator was a low-voltage machine. But his experiments proved that, as far as the service was concerned, a sufficiently good service could be given with an alternating system to satisfy the public. And this was, of course, one of the points to be ascertained. All the party thoroughly understood that we were looking at a commercial experiment. It was clearly understood that, while we were all extremely pleased at what we had seen, very much more was needed for a commercially successful plant. The plant itself had been paid for out of the experimental fund. The generator was clearly not one that would have been used for an actual plant. The distance was so short that commercially as a business proposition a three-wire system would certainly have been cheaper and better."

Pope, who was intimately acquainted with Stanley's purposes and expectations and who visited Great Barrington in April, 1886, testified in an interference case before the patent office as follows:

"Stanley had established a laboratory in an old factory building in Great Barrington, and was experimenting mainly. as I remember, with converters of various forms and proportions in order to determine which was the most efficient and convenient form. He had an experimental lighting plant in operation, lighting half a dozen stores in the village, half a mile or so from the laboratory, and this I examined with some particularity."

The written evidence is of the same purport. No one can read the contract between Westinghouse and Stanley and reach any other conclusion than that the latter's work at Great Barrington was solely to perfect his invention for the benefit of the Westinghouse Company. One of the provisions of the contract is as follows:

"No extended series of experiments shall be entered upon without first notifying the president or general manager of said company, and receiving his written permission to proceed; it being understood that the company through its general manager. is to direct the general course of experimentation and the nature of the results which it is desired to attain, but that the details of the work are to be carried out by the said Stanley in what he may consider the best manner."

On March 17, 1886, Stanley wrote Westinghouse as follows:

"I am pleased to be able to inform you that the secondary system is being rapidly completed. As I mentioned some time ago, I believe the true way to study it is to give it a commercial test here in town. I have, therefore, run

wires from the laboratory to the village, and have placed a converter in my cousin's store in order to test the commercial necessities. The lamps in the store were running last night. I expect to have three or four lamps in the hotel (the Berkshire House) and in three or four other stores running in a few days more. In short, I expect to have a demonstration of the system ready for inspection within two weeks' time, perhaps sooner. * * * I am striving all I can to finish this system for you at the earliest possible date, but it is expensive work. Possibly you will allow me a longer rest when I have finished my work. I might say a great deal about the system, but, briefly, it is all right. I will send a fuller report in a few days. I am now right in the midst of the work. The working drawings for the converters will be ready very soon."

The testimony both oral and written is absolutely inconsistent with the idea that Stanley was managing the plant as a commercial venture. He had no right to do this and every consideration of honor and self-interest were against it.

Fourth: Even as an experiment the Great Barrington venture was not wholly successful as it broke down before the success of the system was fully demonstrated. Another test had to be made at an expense of $4,000 to the Westinghouse Company. A plant was installed for this purpose at Lawrenceville, near Pittsburgh. The first commercial plant was installed at Buffalo in the latter part of November, 1886.

Fifth: The fact that a charge was made for the lights is the strongest piece of evidence in support of the defendant's contention, but it is thought that it is insufficient to outweigh all the other evidence in the record which points to a different conclusion. When the subject was fresh in his mind and before his interests were antagonistic to those of the complainant Stanley testified as follows:

"Q. What arrangement did you have with the citizens to whom you furnished the light for payment for it? A. I do not remember now the exact arrangement. I was obliged to ask something for the light in order not to light the whole town. I think I received about $8 a year from some of the lights. Nothing from others. I did not erect a plant for the purpose of making money out of it."

In other words it was a defensive arrangement on his part in order to limit the number of lamps to those needed for experimental purposes and also to prevent complications with his neighbors. The amount actually received was ridiculously small and there seems to have been no agreement on either side which was not of the most transitory nature. The fact that a few of the lamps were paid for is not inconsistent with the theory that the use was experimental.

In Manufacturing Co. v. Sprague, 123 U. S. 249, 8 Sup. Ct. 122, 31 L. Ed. 141, the supreme court says, at page 256, 123 U. S., page 126, 8 Sup. Ct., and page 143, 31 L. Ed.:

"A use by the inventor for the purpose of testing the machine, in order, by experiment, to devise additional means for perfecting the success of its operation, is admissible; and where, as incident to such use, the product of its operation is disposed of by sale such profit from its use does not change its character."

### Abandonment.

The court is unable to find sufficient proof that either Stanley or the complainant was guilty of such laches as to warrant the conclusion that the invention was forfeited and abandoned.

## Infringement.

The converters used in the defendant's plant were furnished by the Stanley Electric Manufacturing Company. Those converters when operating in a system supplied with a current of constant E. M. F. depend upon variations of their counter E. M. F. caused by variations of their secondary currents for their self-regulating property. It is asserted, and not denied, that the defendant's transformers were actually designed by Stanley himself. In these circumstances the presumption that they infringe is not a particularly violent one. The defendant's plant exhibits all of the elements of the first and third claims which, all agree, are substantially similar. It employs, in combination, in a system of electrical distribution: First: An alternating current dynamo. Second: Converters electrically connected with the main line conductors in multiple arc. Third: The converters are organized to transform the current in the main conductors into currents of less potential and greater quantity in the secondaries. Fourth: Each converter is made with a primary coil containing such length of wire exposed to magneto-electric induction that when operated by the dynamo with which it is to be used, with its secondary circuit open, the electrical pressure and counter pressure in its primary circuit are approximately equal. Fifth: Lamps in the secondary circuit. In these circumstances the order in which the steps, necessary to produce the desired transformer, are taken would seem to be immaterial. Indeed when the testimony of defendant's experts is considered as a whole it hardly amounts to a denial of infringement of the first and third claims. The complainant is entitled to a decree as to these claims, but without costs.