RANSOME ·CONCRETE CO. v. GERMAN AMERICAN BUTTON CO.

(District Court, W. D. New York. June 27, 1912.)

PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — REINFORCED CONCRETE CONSTRUCTION.

The Ransome patent, No. 694,580, for a reinforced concrete floor extending to the exterior face of a building, and there forming a belt course, with downward and upward extensions forming lintels to the windows below and sills to those above, was not anticipated, and discloses invention; claims 5 to 10, inclusive, also *held* infringed.

In Equity. Suit by the Ransome Concrete Company against the German American Button Company. On final hearing. Decree for complainant.

Edward S. Beach, of New York City, for complainant.
Charles Neave, of New York City, for defendant.

HAZEL, District Judge. This is a bill in equity for infringement of patent No. 694,580, granted March 4, 1902, to Ernest L. Ransome on application filed August 17, 1901, and afterwards assigned to the complainant corporation. The patent relates to the construction of reinforced concrete or monolithic buildings having concrete beams, piers, or columns, floors, and so-called curtain walls. The validity is in issue of claims 5 to 10, inclusive, of the patent. The specification and claims are for a novel method of extending the concrete floor to the exterior of a building, there forming a belt course having a downward extension which forms lintels to the windows below, the belt course capping the piers and windows, and having an upward extension which forms window sills for the windows above. The description, after stating that the invention consists of a reinforced concrete floor over the external piers or walls of a building, and in the formation of the extension into an exterior belt course, continues:

"And when the floor rests upon external piers it further consists in integrally combining with the floor beam-like extensions above and below to carry the floor from pier to pier and at the same time to form the window-heads or curtain walls terminating in window-heads for the story below and the window sills or curtain walls terminating in window sills for the story above."

The claims in controversy read as follows:

"5. A reinforced concrete floor extending to the exterior face of a building and there forming a belt course with a downward extension forming heads or lintels to the windows below, substantially as described.

"6. A reinforced concrete floor extending to the exterior face of a building and there forming a belt course, capping the piers and windows below, substantially as described.

"7. A reinforced concrete floor extending to the exterior face of a building with an upward window-sill extension, substantially as described.

"8. A reinforced concrete floor extending to the face of a building and there forming a belt course with an upward window-sill extension, substantially as described.

"9. A reinforced concrete floor extending to the face of a building with downward and upward extensions, substantially as described.

"10. A reinforced concrete floor extending to the face of a building and

there forming a belt course and with downward and upward extensions, substantially as described."

The specification for carrying out the invention says:

"After the wall or piers have been brought to the required height the molds for the floor are set in place, and the floor is extended over the wall or piers and molded into a belt course A', as in Figs. 2 and 3. When the floor A has to rest upon piers, it is made with the downward extension B which extends to the windows C, of which it forms the head, and rests upon the piers D, which it caps, as at B', Between the piers it can be reduced to any required thickness, as at B", Fig. 2. This extension is reinforced with the tension-bar E which by preference extends the length of the building. To the floor A, by preference after it has hardened and the piers G have been built, is also added the upper extension F placed between the piers G. This extension is made of one integral piece with the floor by means of the coil-joint H or other suitable union, and it extends upward to the window K, of which it is the sill. It is by preference rabbeted into the piers."

The claimed advantages of a floor constructed in the manner described were to bind the building together by running the floor across the walls and piers, and to strengthen the building and mold a downward extension from the floor which forms a beam or support for the floor load as well as a lintel or window-head and curtain wall.

The defenses of anticipation and noninfringement are based upon prior French publications in Le Béton Arme of May 10, 1899, and Le Siècle Industriel of August 7, 1897, on the Bon Marche stable construction as described in Nouvelles Annales de la Construction of January, 1899, and on concrete buildings constructed in this country by the Aberthaw Construction Company of Boston. It is shown by such publications from the descriptions and structures illustrated that it was old at the date of the application for the patent in suit to construct skeleton buildings of concrete—that is, to construct piers or columns, floors, and girders or beams of concrete reinforced with steel rods—and to vertically place reinforcing rods for piers and imbed them in concrete by pouring the concrete in molds or forms, such rods ordinarily extending from the tops of the piers or columns to enable any subsequent concrete formation to imbed such portions.

The evidence fairly preponderates that it was unknown to the art at the date of the Ransome invention to extend the floor to the exterior of the building to form a belt course, and then downward to form window-heads and upward to form window sills. Has the patentee by these additions contributed anything novel to the building industry? It is shown that the concrete building art had fairly progressed when the patentee conceived his improvement. For instance, there was the Singrun mill in France, which, according to the witness Ellinger, was built in May, 1900. The piers and roof (a one-story building) were of reinforced concrete, the curtain walls being filled in with brick after the building was practically completed, but the floor was not provided with either the downward or upward extensions. Stress is laid upon the Bon Marche stables in France to anticipate the patent in suit. That structure consisted of reinforced concrete walls extending to the height of the floor upon which the beams, girders, and floor slabs were cast, one story in a direct line above another. The spaces between the piers or columns were filled

in with brick which extended to the window sills, and the lintels were of cut stone. The floor slabs were built separately, and not in connection with downward extensions or with curtain walls or extensions thereto as described in complainant's patent, and therefore it was not anticipatory of the claims in controversy.

Nothing is found in the French publications and drawings in their entirety to describe the downward extensions to the windows, nor to show that the floors of concrete pass through or over the piers. Inspection for instance of figure 1, plate 3, of the Bon Marche stables, appearing in the Nouvelles Annales de la Construction for January, 1899, would seem to show that the primary beams are put in place prior to locating the reinforcement of the floor, and their ends socketed to the inner side of the pier. Complainant's expert witnesses support this claim, and a number of other essential differences from complainant's construction are pointed out by them, but any different methods of building or forming the floor need not be discussed in detail, since it suffices that the combination of the elements of the claims in suit are not present in the illustrated structures. Moreover, the generality of the descriptive matter in the French magazines prevents even the skilled in the art, I think, from fully understanding the particular manner in which the concrete floors were constructed. As said by Judge Coxe in Westinghouse Electric & Manufacturing Co. v. Saranac Lake Electric Light Co. (C. C.) 108 Fed. 221:

"The burden of proving anticipation rests upon the defendant and he must do this by clear and convincing evidence. [Citation.] The publication relied on must describe the invention in such a complete, clear, and precise manner as to enable those skilled in the art to reproduce it without the aid of the patent. If the differences are only those which the skill of the art will readily supply, the publication will not be destroyed as an anticipation, but it will be destroyed if these differences relate to essential features, and independent investigation and experiment are required to explain obscurities and supply omissions."

Assuming that the exhibit illustrations and sketches of concrete buildings make clear that the concrete floors were carried to the outer face of the building, yet they do not clearly indicate a belt course capping the piers and a downward extension forming window sills, the essential features of claims 5 and 6.

As to prior construction in the United States. The Springfield boiler house shows a roof abutting against the inner side of the cornice stone, but obviously it is without the downward extension of the patent in suit. In the New England Life building there is a roof and cornice which, according to the oral evidence, fail to extend down to the upper portion of the window, while the lintel is a part of the frame molding, the extension being only to the moldings over the window; nor have the Boston City or McLean Hospitals the downward extensions of the claims in suit. The Ransome improvement specified in claims 5 and 6 is not suggested by the prior art or the exhibit publications and printed articles, and the combination presenting new elements was, in my opinion, for a patentable discovery, a method of constructing concrete floors and buildings which has been, and now

is, extensively used by the skilled in the art and its utility and value recognized.

The defendant denies infringement, denies that its concrete floors are extended over the walls or piers to form a belt course, denies that its building at Rochester, N. Y., has upper or lower curtain walls extending to the windows, but I think it proven that its extension floors and piers form a plain belt course which extends horizontally around the building on the exterior thereof in the manner described by the patentee. There are, it is true, some differences of construction, and the defendant's belt course at first blush would indicate that only the ordinary floor beam had been positioned between the piers or columns, but a closer examination of the model shows that there is present a downward extension of the floor at the inner side of the piers which yields the advantages of complainant's downward extension.

The essential feature of claims 7, 8, 9, and 10 is obviously the upward window-sill extension, and, if it were uncombined with new elements, the concrete floor extending to the exterior face of a building (claim 7), the belt course with the upward extension (claim 8), the downward and upward extensions (claim 9), and the belt course with the downward and upward extensions (claim 10), I would be disinclined to hold that it involved invention to make such addition. The specification points out that the upward extension is placed between the piers and made of one integral piece with the floor by means of a coil-joint and by preference is rabbeted into the piers. This alone, in view of the manner in which floors, beams, girders, and piers were constructed, was scarcely a patentable thing to do, but was something an ordinarily skilled builder could accomplish without the exercise of the inventive faculty, yet such element in combination with the other elements produces a new and useful result, and, while the Ransome improvement in its entirety does not rank as a great one, still I am satisfied by the proofs that the invention is entitled to favorable consideration. It lessened the cost of factory buildings by making it possible to construct them wholly of concrete, and strengthened the floors, girders, and piers. As the defendant in the construction of its buildings inserts a curtain wall of concrete between the piers which projects upward and terminates in window sills, it also infringes the claims which include as an element the upward extensions.

A decree may be entered, with costs, holding claims 5 to 10, inclusive, valid, and infringed by the defendant corporation.