## SQUIER v. AMERICAN TELEPHONE & TELEGRAPH CO.*

District Court, S. D. New York. September 3, 1924.

1. Patents ⊕⇒82—Army officer, procuring patent under statute and publicly announcing dedication to public held precluded from thereafter denying dedication (35 USCA § 45).

Where army officer, who obtained patent, under Act March 3, 1883 (35 USCA § 45 [Comp. St. § 9441]), on device perfected while using public money, publicly announced through newspapers and otherwise that he dedicated his invention to the public, and that it could be used by any one without payment of royalties, he could not, eight years later, and after defendant had commenced to install an alleged infringing device retract his dedication.

2. Patents ⊕⇒82—Inventor "abandons" invention to public when he makes express declaration to that effect.

An inventor "abandons" his invention to the public when he makes an express declaration to that effect, and a declaration that a particular invention is open to anybody is a declaration of abandonment of any special right thereto.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Abandon —Abandonment.]

3. Patents ⊕⇒82—Invention may be abandoned to public after issue of letters patent.

An invention may be abandoned to the public after issue of letters patent, as well as before they have been issued.

In Equity. Suit by George Owen Squier against the American Telephone & Telegraph Company. Complaint dismissed.

Affirmed in 7 F.(2d) 831.

Wm. H. Davis, R. Randolph Hicks, and Samuel E. Darby, Jr., all of New York City, for plaintiff.

Charles Neave, Wm. R. Ballard, and C. C. Rose, all of New York City, for defendant.

---

*Reporter's Note.—This opinion as originally published in 20 F.(2d) 268, inadvertently omitted an important part, which required, in the interest of our subscribers, reprinting the entire case.

KNOX, District Judge. [1] At the time this suit was tried the plaintiff was Chief Signal Officer of the United States Army, with the rank of Major General. Since his graduation from West Point in 1887, Gen. Squier has devoted his time and talents to the army service, giving particular attention to communication systems. Entering the army's Signal Corps in 1898, he became familiar with all forms of signaling, including wire telegraphy. When wireless communication began to demonstrate its practicality, he promptly undertook a consideration of its possibilities.

In the Appropriation Bill of March 1, 1909, the Congress appropriated the sum of $30,000 for the purchase and development of wireless telephone apparatus by the Army Signal Service. Plaintiff was designated by his then superior officer, Gen. Allen, as the person who should undertake the research work contemplated by the grant of the funds. He proceeded to visit in various sections of the country the laboratories of individuals and companies engaged in experimental work having to do with wireless communication. Returning to Washington, he became absorbed in the study of the art, and finally conceived the idea that it was available for use in creating an extra channel of communication in connection with the established lines of telephone systems; that is, the so-called wireless communication was believed to be adaptable to ordinary telephone wire. Gen. Squier realized that, if this could be accomplished, it would be a long step forward in the art of multiplex telephony.

Various kinds of apparatus thought to be suitable for experimentation were purchased and installed in a laboratory in Washington. In company with two selected assistants, Gen. Squier enthusiastically went to work. During the course of his activities, he kept a notebook, in which entries were made of what he did and had in contemplation. For example, he wrote as follows under date of November 18, 1909:

"It seems highly desirable to try experiments in wireless transmission of intelligence, to determine the effect of high-frequency alternating currents of a period beyond the range of audition."

From then on a series of investigations and experiments took place. As a result, he succeeded in evolving the disclosures set forth in United States letters patent No. 980,356, which issued upon January 3, 1911.

Before application was made for the patent, plaintiff had brought his accomplishments to the attention of Gen. Allen. That officer, being impressed with their importance, was desirous that they should be adequately protected for the United States. Being aware of the existence of the patent provisions contained in the Appropriation Act of March 3, 1883 (35 USCA § 45 [Comp. St. § 9441]), it was decided, apparently with plaintiff's approval, to take advantage of its terms. A letter was addressed to the Adjutant General of the Army, which, after setting forth what was in contemplation, and pointing out that the laboratory in which the discovery was made had been established for original investigation, and that it was desired to proceed so as to establish a precedent, the advice of the Judge Advocate General was sought in answer to the following inquiries: (1) To whom should the patent be issued? and (2) In whom would its property rights rest?

The letter was brought to the attention of the Judge Advocate General, and that official gave expression to his views in a letter to the Adjutant General under date of November 4, 1910. After expressing the opinion that Maj. Squier might properly apply for and receive the patent, he continued:

"It is assumed that the property rights * * * spoken of are those accruing from the issue of the patent. The patent, if issued, will vest the property rights in Maj. Squier; but the final clause of the above-cited act is to defeat any property rights in the patent within the territorial limits and jurisdiction of the United States, as such rights are prevented from accruing in Maj. Squier's behalf, in the operation of the last clause of the statute. It is therefore recommended that Maj. Squier be authorized to apply for a patent in the operation of the Act of March 3, 1883, as it is the operation of that act to throw it open to public and private use in the United States; no further action would seem to be required of Maj. Squier."

The pertinent portion of the Act of March 3, 1883, reads as follows:

"The Secretary of the Interior and the Commissioner of Patents are authorized to grant any officer of the government, except officers and employees of the Patent Office, a patent for any invention of the classes mentioned in section forty-eight hundred and eighty-six of the Revised Statutes, when such invention is used or to be used in the public service, without the payment of any fee: Provided, that the applicant in his application shall state that the invention described therein, if patented, may be used by the government or any of its officers or employees in the prosecution of work for the govern-

ment, or by any other person in the United States, without the payment to him of any royalty thereon, which stipulation shall be included in the patent."

Pursuant to departmental instruction, a Patent Office examiner drafted the specifications and claims of the patent, which, with the application, were duly filed and allowed, as above set forth. As issued, the patent contained the language of the statute as to the use to which it might be put without the payment of royalties, and in addition bore this inscription: "Dedicated to the public."

Coincident with the issuance of the patent, Gen. Allen, with the assent and approval of plaintiff, made this announcement to the Press:

"The Chief Signal Officer of the army announces that, as a result of recent experiments by the Signal Corps, multiplex telephony is now practicable; that is, several independent conversations may be carried on simultaneously over the same wire circuit.

"It has also been shown that two wires are no longer necessary for efficient telephony, but that a single wire with 'silent earth' connections can be used for multiplex telephony. All of the necessary instruments required in multiplex telephony are already developed, and can be purchased from dealers in the open market.

"The superposition of additional telephone conversations upon a wire circuit does not interfere in the slightest degree with the operation of the present telephone installations, which remain unchanged.

"The unrestricted use of this method is free to all people in the United States. A description of the method is given in patents numbered 980,356, 980,357, 980,358, and 980,359, copies of which may be purchased from the Commissioner of Patents at 5 cents each. There is no royalty or other expense attached to the use of this system. The system, giving two independent telephone conversations over a single circuit, is now in operation between the research laboratory of the Signal Corps at the Bureau of Standards and the Signal Corps Construction Laboratory, at 1710 Pennsylvania avenue N. W.

"The multiplex is the culmination of the life work of Maj. Squier. No one connected with the service challenges his unquestioned right to have retained the invention for his own use and profit, and the patents were issued in his name. That he chose to give them freely to the public gives an added and romantic interest to the story of a really wonderful and important invention."

This announcement was widely heralded, attracting much attention, both upon the part of the public and of persons interested in the art. Among the latter were representatives of the defendant corporation, which is here charged with having infringed Claims 2, 3, and 7 of the patent.

In view of the defense that the patent, if infringed, and this is denied, has been effectually dedicated to the public, and will not support the suit, the foregoing statement of facts is believed not to have been without some justification. If this defense be valid, the technical features of the patent, and of the alleged infringing devices, need not be considered.

Subsequent to the foregoing announcement by Gen. Allen, the plaintiff granted numerous interviews to newspaper reporters, and spoke at several meetings and dinners of technical societies. On one such occasion he spoke substantially to this effect:

"I will say that I do not want one penny from any one for the discovery. There will be no royalties attached to the use of the plans and specifications, and the American Telephone & Telegraph Company, the War Department, you, or I are as welcome as can be to take copies of these specifications and build multiplex telephones. I have arranged it so that these patents are in the name of the government and the people of the United States."

The following language was employed in the course of a discussion of his invention before the Telephone Society of Washington on March 2, 1911:

"We wish it understood that this work is absolutely free to the public, and that the patents which have been taken out are perfectly free to any person or corporation who wishes to use them. The desire is that, if they are of any use to any one, they may be freely used by all who wish to do so, * * * if, by our investigation, we have made any contributions to that happy end [of filling in the gap in the theory between pure radio telegraphy and wire telegraphy and telephony], we are very much pleased."

On the same evening, plaintiff, so it is testified, gave a printed description of his invention to an officer of the defendant, telling him to make whatever use he desired of it. More than three years later, Gen. Squier wrote to Gen. Carty, vice-president of the American Telephone & Telegraph Company, with regard to later patents, making this reference to certain others, among which was the one in suit:

"Although, as you know, my previous United States Wired-Wireless patents were

presented to the public, yet the present application is my personal property."

Meanwhile defendant's experts were working along the lines of multiplex telephony. Certain apparatus, claimed to have been developed independently of the Squier patent, was devised and perfected. In addition, new arrangements of currents, carrier lines, etc., were effected, until it became possible for three, and then five, conversations to be carried on simultaneously over the same wires. The first commercial installation was made by defendant upon its lines between Baltimore and Pittsburgh. This occurred in September, 1918. The following December, a number of scientific men made an inspection of the installation at Baltimore. Gen. Squier was among their number. When the meeting was over, he returned to Washington by automobile, having as a companion a member of his staff, named Mauborgne, likewise an army officer. The demonstration they had just witnessed was a topic of conversation, and the plaintiff was much gratified to have repeated to him a remark made earlier in the evening by an eminent engineer of telephony by the name of Colpitts, which was: "When all is said and done, the real credit for this achievement should go to Gen. Squier." By way of reply to Mauborgne, the plaintiff said:

"They [the defendant] really have done so much that I think it would be well if you would sit down and write them a letter as my chief engineer, and tell them how much we appreciated this, and also suggest that they try out or give some consideration to the idea of using a ground return instead of putting the current in a pair of parallel wires and not grounding the system."

Such letter was written upon December 12, 1918. Throughout all this period from January 3, 1911, to December 12, 1918, plaintiff's voice was not heard to question, let alone deny, that his invention had been dedicated to the public.

In November, 1918, the Army and Navy Patent Board, an organization created during the war, requested the Judge Advocate General of the Army to render an opinion as to the construction properly to be given to the patent section of the Act of March 3, 1883. An opinion was rendered upon March 21, 1918. It held that the words, "any other person in the United States" (as used in the act), should be interpreted as equivalent to "any other *like* person in the United States;" that is, any other person "in the public service," or (and I regard this as a mere paraphrase) any other person "in the prosecution of work for the government."

Later the matter was placed before the Acting Attorney General of the United States, and upon March 22, 1920, he reached a result, saying:

"It was clearly the intention of Congress to encourage the filing of applications under the act, so that such rights, as defined above, would be available to the government. To construe the statute to mean that the invention would be dedicated to the public would defeat the very purpose for which the statute was enacted, since it would discourage, rather than encourage, the filing of applications under the act." Also that " * * * it is no serious consideration that he is relieved of the payment of the usual Patent Office fees. Were he not, he would be in the anomalous situation of dedicating his rights to the public and paying for the privilege of doing so."

On March 20, 1919, plaintiff's attorney, in his behalf, wrote to defendant, taking the position upon his behalf that the act under which the patent issued did not permit of its use by persons not engaged in work for the government, and that any such use would be prosecuted as an infringement of Gen. Squier's exclusive right.

The foregoing narrative thus presents the question as to whether the patent, either by operation of the statute under which it was issued or by the conduct of the plaintiff, has been dedicated or abandoned to the public.

As to the statute, plaintiff takes the position that a patentee thereunder is invested with all the rights which the laws of the United States confer upon inventors who fulfill the requirements of the patent laws, and that the intent and effect of the act of 1883 is to authorize the Secretary of the Interior and the Commissioner of Patents to dispense with the usual patent fees, provided the patentee grants to the United States government, its officers, employees, and all other persons, *the right to use said patent in the prosecution of work for the government.* The argument is to the effect that the United States, with respect to the inventions made by persons within the specified classes, consented to waive the ordinary fees in consideration of the definite settlement with such persons of all questions that were likely to arise out of the relation of employer and employee, as between the government and the government officers, and which might arise out of the use of such patent by nonofficial persons engaged in the prosecution of work for the United States.

In considering this line of argument, it should be recalled that as far back as 1843

the Supreme Court, in McClurg v. Kingsland, 1 How. (42 U. S.) 202, 11 L. Ed. 102, held that, where an employee makes an investigation during the course of his employment and at the employer's expense, the employee retains title to the invention, but the employer has a shop right to it in his own business. While the specific application of the rule to a government employee seems not to have come before the Supreme Court until the case of Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 34 L. Ed. 667, was presented in 1890, there was no hesitancy, either by the court of first instance or by the appellate tribunal, in holding that a government employee, under the circumstances there present, was on a plane no different than that of the employee of a private concern.

Nothing has been called to my attention giving rise to the suggestion that there was any demand upon Congress to legislate, so as to bring about the settlement of a question that was causing no agitation or concern to any one. If the right of the government to enjoy a shop right in the invention of its employee was not in controversy, and did not move the legislative will, the only possible gain to the government, through the enactment of the statute, was that such invention might be used by contractors engaged in doing government work. So far as I can ascertain, no real question upon this proposition had as yet come up, and it is difficult to believe that Congress, in the presence of no special reason for its action, was desirous of settling the rights of patentees whose inventions might be used by contractors engaged in government work.

Again, if Congress intended to settle the questions suggested by counsel for complainant, the effort was somewhat abortive, in that the act imposes no compulsion upon a government employee, who had made an invention that he wished to protect by a patent, to make application under the provisions of the act of 1883. So long as he is content to pay the usual patent fees, the employee is at complete liberty to apply for and to receive a patent upon an invention made in the government service; and thereafter, if the government or its contractors use the invention, may raise both of the questions which complainant contends were to be of no further moment. Had such really been the purpose of Congress, I think it not improbable that the statute would require a government employee, wishing a patent upon his invention, made in the public service, to apply for the same under the act of 1883, and not under another.

There is, I believe, no good reason to doubt that the statute under consideration means exactly what its words, as they appear and are arranged, declare. Throughout all of our history, there have been persons in the employment of the United States who wished above all else that their services and accomplishments should be availed of, not alone by the government as an entity, but also, so far as possible, by the people themselves. As regards inventions made by such persons, the statute is well designed to enable them to recognize any sense of obligation and duty to the public which they may feel, and to make certain that no frustration of the objects of their desire shall occur. The act effectually precludes the possibility that an invention which it is desired to dedicate to the public might, in the absence of legislation, be denied to them; or, if not wholly denied, be made to serve the private ends of some one not responsible for the invention. In other words, the act serves to insure to the people the benefit of such inventions as employees and officers of the government wish to dedicate to them.

Some such thought as I have attempted to convey gained lodgment in the minds of the officials of the Patent Office, and of numerous employees and officers of the government. Otherwise there would not have been issued by the office and accepted by patentees over the period of years from 1907 and 1918, one hundred and sixty-four patents marked "Dedicated to the Public." Subsequent to the enactment of the statute, and prior to 1907, only four patents seem to have issued. They contained a reference to the act under which they were granted, but otherwise were in the form in which all patents were issued. While the inscription, "Dedicated to the Public," has no statutory authority for its presence upon the patents to which reference has been made, it is indicative of the belief of persons administering the act, and of those seeking the use of its provisions, as to its object and purpose.

Not until the latter part of 1918, and early in 1919, was it that the then Judge Advocate General, and the Acting Attorney General, respectively, rendered an opinion giving the statute the construction for which complainant argues. The Army and Navy Patent Board had then come into existence. In the course of its work, it asked the Judge Advocate General for his views upon the subject of the statute. In reply, that officer said, among other things, the following:

"In particular you state that the Patent Office construes the proviso above quoted as giving any person in the United States the

right to use an invention patented under the act without the payment of any royalty, whereas your Board contends that it can be so used only by the government, its officers or employees, or other persons in the prosecution of work for the government.

"The question which interpretation is correct becomes of moment because many members of the military forces have refused to apply for patents under the act for inventions of considerable value to the government, if the interpretation given to the act by the Patent Office is to prevail, while they at the same time have expressed their willingness that the government shall use their inventions, if they may retain 'the commercial rights' therein. It may be added that the matter is of special interest to the War Department, in view of the invitation recently given by the department to persons in the military service to patent their inventions under this act."

Then followed the opinion above referred to.

Neither the Judge Advocate, nor the Acting Attorney General, who then discussed the statute, referred to the long-continued practice of the Patent Office in marking patents secured under the act as being "Dedicated to the Public," nor to what seems to have been the common acceptance of the meaning of the act. The ruling of the Judge Advocate General in 1910 was likewise not considered. To me, the long-continued course of conduct upon the part of persons vitally interested in the administration of the law is not without some persuasive force in an endeavor to reach a correct conclusion.

No purpose will be served by an analysis of the opinions of the Judge Advocate General and the Acting Attorney General. While their arguments have some element of appeal, I find myself unable to adopt their conclusion.

But, granting that these officials were correct, and that I am wrong, as not infrequently is the case, what shall be said to be the effect of complainant's action and declarations concerning the patent subsequent to its issuance?

The answer he gives to this query is that all that he said and did in the way of evincing an intent to abandon and relinquish his patent rights was due to a misconception of the legal effect of his application for and acceptance of the patent under the statutes, and that for such reason his words and actions in the premises are not to be chargeable against him. Further, it is said that the legal effect of the statute and the patent was open to defendant's judgment and opinion, and that, if these were erroneous, the situation in which

defendant finds itself is unfortunate, but it is not to be regarded as affecting plaintiff's rights under the grant.

Had complainant been content to rely upon the legal effect of his patent and refrained from proclaiming his generosity to the public, and from urging the defendant to make use of his invention, his contention might be arguable.

[2] Mr. Walker, at section 89 of the fifth edition of his work on Patents, says:

"An inventor abandons his invention to the public when he makes an express declaration to that effect. And a declaration that a particular invention is open to anybody is a declaration of abandonment of any special right thereto."

[3] In support of these statements, the author cites Kendall v. Winsor, 21 How. 328, 16 L. Ed. 165, Westinghouse Electric & Mfg. Co. v. Saranac Lake Electric Light Co. (C. C.) 108 F. 224, and (C. C. A.) 113 F. 885. It is further said at section 106 of the same work that no abandonment of an invention after the issue of letters patent has ever been judicially declared to exist in the United States. While this may be true, the absence of such adjudication, I take it, does not mean that the abandonment of letters patent is impossible. Judge Leavitt, in Bell v. Daniels, 3 Fed. Cas. 96, No. 1,247 said that—

"This abandonment, or dedication to the public, may be made as well after patent granted as before; but, where the patent has actually been granted, it would undoubtedly require a strong case to prove abandonment."

In Hovey v. Henry, 12 Fed. Cas. 603, No. 6,742, the court in charging the jury in a patent case said this:

"With regard to the abandonment, there must be evidence of a distinct character, showing such an intention."

In Williams v. Railroad Co., 4 Ban. & A. 441, Fed. Cas. No. 17,716, Judge Wallace intimated that in a proper case an abandonment might take place, and in Wyeth v. Stone, 30 Fed. Cas. 723, No. 18,107, declared that it could take place. Abandonment frequently occurs with respect to other species of property, and I am not persuaded that one may not take place as to letters patent. On the contrary, I believe that an abandonment may take place.

Regarding the possible loss of the right of property in trade-marks upon the ground of abandonment, the Supreme Court had this to say in Baglin v. Cusenier Co., 221 U. S. 597, 31 S. Ct. 674, 55 L. Ed. 863:

"There must be found an *intent* to aban-

don, or the property is not lost; and while, of course, as in other cases, intent may be inferred when the facts are shown, yet the facts must be adequate to support the finding. 'To establish the defense of abandonment, it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon. Acts which, unexplained, would be sufficient to establish an abandonment, may be answered by showing that there never was an intention to give up and relinquish the right claimed.' Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, p. 31 [21 S. Ct. 7, 11, 45 L. Ed. 60]."

In my opinion, the facts in this case, and the explanations that have been given by Gen. Squier are not such as to overcome his express and frequently repeated declarations of his intent to the effect that "he wished it understood that this work is absolutely free to the public, and that the patents which have been taken out are perfectly free to any person or corporation who wishes to use them." "The desire is that if they are of any use to any one, they may be freely used by all who wish to do so."

As bearing upon complainant's alleged misconception as to the law under which the patent issued, this much may be said: The evidence establishes his dedicatory intent to have been definitely formed and complete at the time application for patent was made. Deliberate resort was made to the statute of 1883, because it was intended that the free use of the invention, instead of being limited to the government and to persons engaged in work upon its behalf, should be open to any person in the United States who desired to take advantage of its disclosures. That the choice of statutes was free and deliberate is evidenced by the fact that complainant colloborated in the official statement made at the time the patent issued, which contained the excerpts hereinbefore quoted.

One more observation and I shall desist. Complainant made no retraction of his words of dedication and abandonment until after defendant had begun the installation of the system of communication claimed to infringe. Had complainant, over the preceding seven or eight years, not made use of comprehensive dedicatory statements, and relied solely upon his legal rights, whatever they might otherwise be, it is not unreasonable to suppose that defendant, before committing itself to the development of the particular systems of "wired wireless" that is now employed, would have taken steps to acquire a license, or by other means have sought to avoid the possibility of an infringe-

21 F.(2d)—48

ment claim such as is now made. That opportunity is gone, through its reliance upon the words of the complainant, and I cannot believe that defendant, if it makes use of the disclosures made by Gen. Squier, should be called upon to pay tribute to him.

Reaching these conclusions, it is unnecessary to pass upon the merits of complainant's invention. The complaint is dismissed.