---

## BEECROFT & BLACKMAN, Inc., v. ROONEY et al.

(District Court, S. D. New York. October 20, 1920.)

### No. E16–240.

1. Patents ⬤129—Estoppel to deny that patentee was first inventor.

Defendants, who made no objection when advised by complainant that he intended obtaining a patent for an invention which they had discussed together, under which they should have a shop right so long as he remained in their employ, but acquiesced and for some years manufactured the patented device, *held* estopped to deny that complainant was the first inventor.

2. Patents ⬤328—1,244,944, for cabinet stand for talking machines, valid and infringed.

The Beecroft patent, No. 1,244,944, for a cabinet box stand for talking machines, *held* valid and infringed.

3. Patents ⬤187—Shop right not established.

Defendants *held* not to have any permanent shop right to manufacture under a patent obtained by an employee, where they were notified by him, before making any considerable expenditure for such manufacture, that the shop right would be limited to the term of his employment.

In Equity. Suit by Beecroft & Blackman, Incorporated, against Laurence J. Rooney, doing business as Laurence J. Rooney Company, and the Long Furniture Company. Decree for complainant.

W. H. Crichton Clarke and George B. De Luca, both of New York City, for plaintiff.

James H. Griffin, of New York City, and E. G. Siggers, of Washington, D. C., for defendants.

LEARNED HAND, District Judge. This is a suit upon a patent granted to Clement Beecroft on October 30, 1917, for a cabinet box stand for talking machines. He is assignor to the plaintiff, which is a corporation, of which he is a member, and the infringement of the patent by the defendant is conceded. Four defenses are raised: First, that Beecroft is not the first inventor; second, that the patent is invalid; third, that the defendant has an implied shop right; and, fourth, an express shop right.

Before going into the defenses, it is necessary to make some statement of the character of the patent itself, and in order to do that the most intelligent way is to describe the prior art. It appears that the Victor Talking Machine Company, which every one knows is a very large manufacturer and seller of these talking machines, had two kinds of models: First, what I may call a table machine; and, second, a floor machine. The table machine consists of a square box which contained the mechanism for rotating the plate, the dial, and tone arm, and which is only about a foot or 18 inches in height. This is a good deal cheaper than the larger machine, which was intended to stand on the floor, and had a closed cabinet belowing the talking machine proper. Within this cabinet it was customary to keep the records and books of records, as every one knows.

It was early discovered by shrewd manufacturers and salesmen that they could undercut the larger Victor machine by a cheaper stand or cabinet, separate from the talking machine proper, and so arranged that the table machine might be placed upon the stand and held firmly in position. The base of the original table machines had a straight-edged molding on four sides, which the top of the cabinet could be made exactly to fit, so that the two would give the appearance of the larger machine. Thus the stands were made with a molding around the edges, into which the straight molded edges of the table machine fitted, insuring not only absolute alignment, but no displacement when the machine was wound up.

It was in this stage of the art that the plaintiff's patent appeared. He seems to have first suggested to the defendant the idea of manufacturing these stands, though there in no invention in that, and no one claims it. Some time in January or February of 1915 the Victor Company (which had become quite alive to the practice that had grown up in the trade), with a good deal of ingenuity, I think, devised a table machine which they thought would prevent its further continuance. Instead of having the base of the table machine a straight-edged molding, which could be made to fit solidly on top of the stand and give the appearance of a single piece, like their floor machines, they

made the base with four legs and a scroll running along the side. The consequence was that, if any one placed the table machine upon a stand, such as the defendant was manufacturing, it would appear at a glance that it was not the floor machine, but that it was a poor makeshift. Obviously the market of the defendant for their separate cabinets was very much injured.

This caused a good deal of concern to the defendants, and apparently to other manufacturers, who were doing the same thing as they. For some time it was impossible to see the new table machine which was called by the Victor Company No. 9, but eventually, on the 28th of February, A. C. Long, who is the general manager of the defendant, with the plaintiff, if I may call him so, Beecroft, did see one of these new model Victor No. 9 table machines in New York. Long at that time measured very carefully the external dimensions of the base of this machine, and as well as he could make a sketch of the scroll which connected the two. He had a model made in the shop, as nearly as he could from these measurements and the drawings. Through the month of March, 1913, it is quite clear from the correspondence that Naill, the sales manager of the defendant, was concerning himself with, and was writing to Beecroft about, the most effective way to meet this last move of the Victor Company. He made several suggestions, and Beecroft made several suggestions.

Beecroft's suggestions seemed at that stage to have been rather ineffective, and would not have turned out to be practicable. On March 27th Naill asked Beecroft to come to the residence of the defendant, which is in Hanover, Pa., for the purpose of an interview concerning this matter, and it is unquestionable that he came there on the 29th of March, which was a Monday. He had an interview, I have no doubt, although that is in dispute. I say I have no doubt, because of the contemporaneous entries made in his diary at that time. The fact that this is denied in no sense is any imputation on the witnesses who deny it, for any such matter, now being at a distance of over five years, may have escaped their recollection.

What took place at that interview determines the issue of priority, and it is as well, therefore, at this point, to describe what the invention was. In order to cover the legs and scroll of the new No. 9, the patent discloses a molding rising from the top of the stand to the level of a bead at the bottom of the skirt or waist of the table machine. Since the legs and scroll flare outwardly, the molding must be bent inward to meet the bead at the bottom of the waist, else there will be an unclosed gap of about one-quarter of an inch, which would betray the fact that the machine was not single. But to bend inwards all four moldings was to make it impossible to set the table machine on the top of the cover. Hence the patent disclosed one removable molding and directed that the machine should be slipped in place; the removed molding being then reset.

This invention Beecroft says that he disclosed fully at the interview of March 29th, using a borrowed machine then there. This is sharply disputed by Long and Naill, and must, taken alone, be doubtful. I really do not believe that there was any borrowed machine

present, and I think that probably the model made by Long was present, as he says it was. Be that as it may, certainly Naill and Beecroft were in Baltimore the next day looking for a machine, and Naill that night wrote a letter to Long, which pretty effectually disposes of Beecroft's claim. He there shows a device very similar to the patent, but with the moldings straight, so that the machine can be lifted in and out. The resulting interstice between the bead of the waist and the bead of the molding he complains of as a defect, which it was. I find that letter compelling proof that Naill could not have heard or understood Beecroft, if Beecroft disclosed the complete invention on the day before, and I must own that it is impossible to suppose that he did not understand it. If the case stopped here, I should, I think, be obliged to hold that the defendant had carried even the burden of proof beyond a reasonable doubt.

[1] However, in view of the later conduct of the parties, I do not find it necessary to make any finding whatever on that issue, because I think that, even though the fact be as the defendant asserts, they are estopped to assert it. The result is that I do not mean to uphold the patent in general, but I do against this defendant. The facts on which the estoppel depends are as follows:

Beecroft was again in Hanover on April 10th, and on April 12th he wrote to Naill, saying that he proposed to take out a patent upon this idea, which he had suggested, and that he would entertain negotiations for an exclusive license to the defendant. Naill answered without any dissent, and Beecroft proceeded to retain a lawyer. Again on May 21st Beecroft wrote Naill, saying that it must be understood that the defendant should have a shop right under his patent, when issued, for so long as he continued in its employ. Naill again acquiesced by not objecting. Beecroft went on, filed his application, and paid whatever expenses this occasioned. He continued to serve the defendant upon the understanding created as I have said. Finally, on October 16, 1917, just on the eve of the patent's issue, he again repeated his claim, and Naill again did not protest. Thereupon he paid his fee and got his patent.

All this makes it justly obligatory on the defendant, whatever the facts, not now to raise the issue of Beecroft's first invention. Indeed, it is strong evidence on the issue itself, strong enough at the hearing to have put me in some doubt. On reflection, I feel Naill's letter of March 30th to be more conclusive than I then did; but the result is the same, so far as these parties are concerned. The defendant certainly never meant to dispute Beecroft's claim until some time after suit was brought. When the relations between them broke, and when Beecroft was threatening suit, they raised no such question, but relied upon their shop right. Indeed, they maintained this position, even after suit brought, and it was probably only after their attorneys advised them that they sought to dispute his rights. Certainly it was then too late. Beecroft had too long relied on their inaction, and had done too much on the faith of their assent, to let the whole issue be now unravelled as they propose. Hence, without deciding the issue of first invention at all, I decline to allow it to be interposed

in this suit. Others may urge it, if it becomes relevant later. Even this defendant may dispute the validity of the patent for lack of invention, but that it was their discovery, and not Beecroft's, for what it may be worth, that I think they clearly are concluded against disputing.

[2] The next question is as to the validity of the patent; i. e., whether or not it is for an invention at all. It is quite true that it seems a very simple solution at first blush, and it is not without significance that the examiner originally declined to allow it under a patent to a man named Vaughn for a tray in a baby's chair. I do not think that the mechanical ingenuity involved in the patent requires any invention, and, judged from the point of view of the examiner alone, I should entirely agree with him that, if there was any invention, it was disclosed in Vaughn. I think any shrewd, live artisan would know how to put the machine with the spreading legs inside the four moldings. But that is not the whole story, because the real question is whether it took any invention outside of the capacity of the ordinary artisan to take the new model 9 of the Victor Company, and to fit it into a new stand in such a way as to retain the appearance of a unified structure.

I think, on the whole case, that the patent must prevail. In the first place, it is of some significance to my mind that the Victor Company, which is a shrewd, aggressive organization, devised this machine for the very purpose of preventing exactly what Beecroft accomplished. They thought they had made a machine which would effectively protect them in maintaining their hold on the market for the floor machines, which have been greatly interfered with by the trade practice which had grown up. That is the first bit of evidence.

The second is that there was another effort, by a firm known as Solters, to do the same thing, and they failed. They attempted to make the top moldings of the stand or cabinet such that it would fit the scroll work on the bottom of the new model, and they could not accomplish it because there was an undercut curve on both sides of the legs, which prevented a neat fit.

Again, Naill in his letter to Beecroft of the 27th of March said that it was a "mighty hard job"; and there is Naill's letter of March 30th, in which he made another ineffective effort, just as Beecroft had done earlier. In other words, we have a situation in the art in which people were trying to meet a difficulty which the Victor Company had deliberately devised, to be, I suppose, as baffling as possible. In the face of all this, it does not seem to me that I ought to say it was a work which any journeyman could devise.

[3] The second two defenses I will take up together. The question really is whether the defendants have a shop right. Now, I understand the rule of shop right to be this: That where an employee makes an invention, and allows his employer to develop it with his own resources, and to market it, and establish a trade in it, he cannot, after he leaves the employer, prevent him from going on, and so compel him to lose all the investment that he has put in, and the trade he has established, unless at the outset he gives him some warning. The

rule is entirely equitable; the books put in the form of an estoppel. Gill v. U. S., 160 U. S. 426, 430, 16 Sup. Ct. 322, 40 L. Ed. 480; Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, 37 L. Ed. 1049.

The question, therefore, is how early Beecroft gave the defendants to understand that they were not to have a shop right, and what their attitude was in the face of any declarations of his on that score. The plaintiff urges that the letter of April 12, 1915, was a sufficient notice that Beecroft did not mean to allow them to have any shop right. I think that letter must probably be read as referring only to an exclusive license, and that, strictly speaking, it may not be taken as a dissent from their shop right, though possibly Beecroft thought that it covered that as well. Certainly it showed that at the very beginning he was raising a question as to their manufacture. However that may be, on May 21st, which was about six weeks later, he wrote a letter which showed very clearly that he meant to limit any shop right to the term of his continued employment with them, and unless they had at that time acquired a complete shop right, no act of theirs thereafter could bestow it upon them,. for it was a very clear warning.

What had they done before May 21st? They had made moldings; they had completed some of their stock, though the amounts are not very great. Mr. Siggers shows me in a book, in one instance some 13 moldings, and in another some 4 moldings; but the moldings are not very numerous. · The exact amount that they had invested up to that time does not appear. They had not, I think, actually marketed any, or if they had, they were very few. They went on after the 21st of May, without any dissent from Beecroft's assertion that their shop rights were to be limited to the term of his employment, and they went on after October 16, 1917, without any such dissent, allowing him to act upon a very natural inference arising from their apparent consent. As the whole matter is equitable, it seems to me very clear that their time to protest was at the time when they got the first clear notice. I think their inaction and their failure to prove that there was any substantial investment before May 21st takes the case out of the ordinary rule.

I therefore feel that the evidence justifies overruling the defenses of the defendants, and plaintiff may take a decree, but without costs.